**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| BASCOM GLOBAL INTERNET SERVICES, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:14-cv-3942-M |
| AT&T MOBILITY LLC and AT&T CORP., | § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff BASCOM Global Internet Services, Inc. ("BASCOM") brings this action

against Defendants AT&T Mobility LLC and AT&T Corp. (collectively, "AT&T")[1] for

the alleged infringement of U.S. Patent No. 5,987,606 ("the '606 Patent"), which claims a

method and system for filtering Internet content.  AT&T moves to dismiss BASCOM's

suit under Fed. R. Civ. P. 12(b)(6), arguing that the '606 Patent claims unpatentable

subject matter under 35 U.S.C. § 101.  For the reasons stated herein, AT&T's Motion to

Dismiss [Docket Entry #23] is **GRANTED**.

## BACKGROUND OF THE INVENTION

The patent-in-suit is directed toward a method and system for filtering Internet

content in a manner that is customizable for each Internet user.  '606 Patent at 1:7–11.

Filtering Internet content may be necessary in both the employment and household

settings, as companies may wish to restrict their employees' access to certain websites,

and parents may wish to do the same for their children.  *See id.* at 1:30–35.

---

[1] BASCOM initially sued AT&T Inc. as well, but then dismissed AT&T Inc. on January 15, 2015 [Docket Entry #19].

According to the "Background of the Invention," initial attempts to filter Internet content were implemented directly on the personal computer ("PC"), which simply stored a database of allowed or disallowed websites ("the single-user configuration"). *Id.* at 1:58–59, Fig. 8.  Several problems arose with the single-user configuration, including the prospect that a determined and tech-savvy employee or teenager might thwart or modify the filtering function. *Id.* at 2:1–3.  It could also be time-consuming and costly to install a filter on every PC; different PCs may require modified software; and the database that stores the allowed and disallowed websites must be frequently updated with Internet downloads or disk updates to track changes in the content of Internet sites. *Id.* at 2:3–12.

A "local server-based configuration" uses many PCs, with different software platforms, and connects them together through a local area network ("LAN"). *Id.* at 2:13–17.  The LAN is connected to the ISP's server through a local server and dial-up or fixed connection. *Id.* at 2:17–19.  The local server employs a single set of filtering criteria for all of the users on the LAN. *Id.* at 2:19–23.  Although the local server-based configuration is more difficult to tamper with, it still suffers many of the same drawbacks of the single-user configuration, *i.e.*, it requires costly and time-intensive local installation and maintenance, and the filtering software is limited to the LAN or local server. *Id.* at 2:25–35.  Also, a single set of filtering criteria may not be appropriate for all users on the LAN. *Id.* at 2:23–25.

Prior to the filing of the '606 Patent, some ISPs used a "server-based configuration" in which the filtering function is performed at the site of the remote server. *Id.* at 2:36–39.  However, like the single-user configuration and local server-based configuration, the remote server employs a single set of filtering criteria for all

users, and as a result, suffers from the same one-size-*does-not*-fit-all complications. *Id.* at 2:42–45.

## PATENT-IN-SUIT

The '606 Patent claims an invention designed to overcome the disadvantages in the single-user, local server-based, and server-based configurations by providing individualized, customizable filtering and data storage on the ISP server. *Id.* at 2:52–55. The system claimed requires no special software on the PC or LAN, works with any hardware, operating system, or LAN, allows users to select a variety of filtering schemes and elements, and remains difficult to tamper with or circumvent. *Id.* at 2:56–65.

In the claimed invention, an ISP server executes or incorporates software with filtering schemes, and accesses databases to obtain filtering elements required by the filtering scheme. *Id.* at 2:66–3:3, 7:3–10. The ISP server then matches individual end-user accounts to the filtering scheme and filtering elements associated with that account, which may, for example, include an exclusive-list filtering scheme and a database of restricted websites, or alternatively, a word or phrase screening filter and database of restricted words or phrases. *Id.* at 3:3–11, 7:3–77, 7:31–34, 7:60–67. The preferred embodiment of the claimed invention covers an ISP server with end-user databases holding additional sets of filtering elements to further customize the filtering scheme. *Id.* at 3:11–15. In the Court's view, Claims 1 and 22 are representative:[2]

---

[2] Claims 1, 14, 18, 22, and 24 are the independent claims of the '606 Patent, and therefore, are most frequently discussed by the parties. AT&T argues that Claim 1 is representative for purposes of the patentable subject matter analysis. BASCOM disagrees, and argues that AT&T has the burden to invalidate each independent and dependent claim of the '606 Patent. March 26, 2015 Hr'g Tr. at 31:8-11. In its briefing, Plaintiff presented Claims 1 and 22 as instructive. *Id.* at 18:9-14. The Court finds that, for the purposes of this § 101 invalidity challenge, Claim 1 is representative of the

**1.** A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:

> a local client computer generating network access requests for said individual controlled access network accounts;

> at least one filtering scheme;

> a plurality of sets of logical filtering elements; and

> a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.

**22.** An ISP server for filtering content forwarded to controlled access network account generating network access requests at a remote client computer, each network access request including a destination address field, said ISP server comprising:

> a master inclusive-list of allowed sites;

> a plurality of sets of exclusive-lists of excluded sites, each controlled access network account associated with at least one set of said plurality of exclusive-lists of excluded sites; and

> a filtering scheme, said filtering scheme allowing said network access request if said destination address exists on said master inclusive-list but not on said at least one associated exclusive-list, whereby said controlled access accounts may be uniquely associated with one or more sets of excluded sites.

---

"Individually Customizable Filtering Claims" and Claim 22 is representative of the "Filtering Scheme Structure Claims."  Pl. Resp. Br. at 4–5 (describing Claims 1–6, 18, 24 and 25 as the "Individually Customizable Filtering Claims" and Claims 7–17, 19–23 as the "Filtering Scheme Structure Claims"); *see Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (holding that a court need not address each individual claim, and instead may address certain representative claims if all the claims are substantially similar and linked to the same abstract idea).

## LEGAL BACKGROUND

The Patent Act addresses what inventions are patentable:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. 35 U.S.C. § 101.

The Supreme Court "has long held that this provision contains an important implicit exception . . . 'laws of nature, natural phenomena, and *abstract ideas*' are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (emphasis added) (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). The Court's recent decisions have particularly scrutinized the patentability of computer-implemented abstract ideas. Because AT&T argues the claims in this case are directed toward an abstract idea and computer-implemented, the seminal cases warrant preliminary discussion.

In *Gottschalk v. Benson*, the Supreme Court considered the patentability of a method for programming a general-purpose computer to convert binary-coded decimal (BCD) numerals into pure binary numerals. 409 U.S. 63, 64 (1972). The Court found the method "so abstract and sweeping as to cover both known and unknown uses of the BCD to pure binary conversion." *Id.* at 68. According to the Court, the claimed method lacked any practical application except in connection with a general-purpose computer, which raised concerns that, if the patent were issued, it "would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself." *Id.* at 71. Accordingly, the Court held the claimed invention was ineligible for patent protection. *Id.* at 72.

In *Parker v. Flook*, the Court held unpatentable a method for updating alarm limits that claimed a mathematical formula for calculating the updated alarm limit in processes involving the catalytic conversion of hydrocarbons.  437 U.S. 584, 594 (1978).  Considering the principles established in *Benson*, the Court noted that the claimed method did not seek to preempt all uses of the mathematical formula, but instead was limited to the oil and petrochemical industry.  *Id.* at 589–90.  The applicant argued that the invention's "'post-solution' activity—the adjustment of the alarm limit to the figure computed according to the formula—distinguishe[d] th[e] case from *Benson* and ma[de] his process patentable."  *Id.* at 590.  The Court rejected the argument that the mere application of an abstract principle rendered the invention patentable, and concluded that the claimed method, including the mathematical formula, considered as a whole, contained no patentable invention.  *Id.* at 594.  The Court found all of the components of the invention were well-known, and the claims only provided a new and better method for calculating alarm limit values, dedicated to a specific purpose.  *Id.* at 594–95.  The Court cautioned that its decision not be read to preclude patent protection for novel and useful computer programs, especially given that computer technology was in its infancy at the time.  *Id.* at 596.

In *Diamond v. Diehr*, the Court addressed the patentability of a process that used a mold to convert raw, synthetic rubber into cured products.  450 U.S. at 177.  Because the temperature inside the mold was difficult to accurately measure, the prior art struggled to measure the precise amount of time necessary to cure the rubber.  *Id.* at 178.  The claimed process involved constantly measuring the temperature inside the mold and feeding those measurements into a computer that repeatedly recalculated the cure time by

6

means of the longstanding Arrhenius equation.  *Id.* at 178–79.  When the recalculated time equaled the actual time that had passed since the press was closed, the computer would send a signal to a device that opened the press.  *Id.* at 179.  The constant measuring of the temperatures inside the press, the repeated recalculation of the time by a computer, and the sending of a signal to a device to open the press were all new in the art. *Id.*

First, the Court described its holdings in *Benson* and *Flook* as mere applications of the longstanding principle that an abstract idea is not patentable simply because the invention involves a computer.  *Id.* at 186.  Next, the Court concluded that "Arrhenius' equation is not patentable in isolation, but when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101."  *Id.* at 189.  The Court considered the "claims as a whole," and found that they were directed toward an industrial process, not the mathematical formula itself, and thus were eligible for patent protection under § 101, leaving questions of novelty and obviousness for a later, separate inquiry.  *Id.* at 192–93.

The Court again addressed the patentability of abstract ideas in *Bilski v. Kappos*, where the patent applicants claimed a computerized procedure for hedging against price changes in the energy market.  561 U.S. 593, 599 (2010).  The Court explained that there is no per se rule that methods of conducting business are unpatentable, but held that the patent application at issue did not claim a patentable "process" under § 101.  *Id.* at 609–11.  The Court found hedging to be a basic and "fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class."  *Id.* at 611 (quoting *In re Bilski*, 545 F.3d 943, 1013 (Fed. Cir. 2008) (Rader, J., dissenting))

(citations omitted).  The concept of hedging, which was described in one of the claims and reduced to a formula in another claim, was held to be an unpatentable abstract idea, like the algorithms at issue in *Benson* and *Flook*.  *Id.* at 611.  Granting the claims patent protection would preempt the use of hedging in all fields and extend a monopoly to the abstract idea itself.  *Id.* at 612.  Finally, the Court noted that *Flook* debunked the notion that "limiting an abstract idea to one field of use or adding postsolution components" could make a concept like hedging patentable.  *Id.*  The fact that the claims were limited to the energy market did not make them eligible for protection.  *Id.*

Most recently, in *Alice Corporation Pty. Ltd. v. CLS Bank International et al.*, the Court held that the claims at issue were directed to the abstract idea of intermediated settlement, and that merely requiring implementation of that abstract idea by a generic computer did not transform it into a patent-eligible invention.  134 S. Ct. 2347, 2352 (2014).  In *Alice*, the representative method claims were directed toward facilitating the exchange of financial obligations between two parties by using a computer system as a third-party intermediary.  *Id.*

Before analyzing the patent-in-suit, the Court explained that its decisions refusing patentability for abstract ideas are rooted in concerns about preemption.  *Id.* at 2354.  In other words, the Court is concerned that a claim directed toward an abstract idea could preempt that approach in all fields, and effectively create a monopoly over the abstract idea.  *Id.* (citing *Bilski*, 561 U.S. at 611–12).  However, the Court reiterated that an invention's mere utilization of an abstract idea does not make the invention ineligible for a patent.  *Alice*, 134 S. Ct. at 2354 (citation omitted).  Patent protection remains available

for abstract ideas that are applied to new and useful ends. *Id.* (citing *Benson*, 409 U.S. at 67).

The Court reintroduced the two-step process for determining the subject-matter eligibility of a patent that incorporates an abstract idea. *Id.* at 2355 (citing *Mayo*, 132 S. Ct. at 1296–98). First, the Court determines whether the patent is directed toward an abstract idea, *i.e.*, "Step One". Second, the Court "considers the elements of each claim both individually and 'as an ordered combination' to determine whether additional elements 'transform the nature of the claim' into a patent-eligible application," *i.e.*, "Step Two." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294). The Second Step is essentially a search for an "inventive concept"—an element or combination of elements that ensures that the practice of the patent amounts to more than a patent upon the abstract idea itself. *Id.*

The Court illustrated Step One by analogizing the patent-in-suit to the invalidated patent in *Bilski*, finding the claimed method of intermediary settlement was also directed toward a fundamental, long prevalent economic practice. *Id.* at 2356 (citing *Bilski*, 561 U.S. at 612).

The Court proceeded to Step Two to determine whether the claims contained an inventive concept sufficient to transform the abstract idea of intermediated settlement into a patent-eligible application. *Id*. at 2357. The Court searched for additional features that might reveal the invention as something more than a "drafting effort designed to monopolize the abstract idea." *Id.* The Court reiterated that an eligible claim cannot recite an abstract idea and merely add the words "apply it." *Id.* (citing *Mayo*, 132 S. Ct. at 1294).

A "patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer,'" and as such, does not confer patent eligibility. *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1301). Because "computers are ubiquitous, the implementation of an abstract idea through a wholly generic computer is not the type of additional feature that satisfies the Court that the invention is much more than a drafting effort to monopolize the abstract idea itself." *Id.* However, "an abstract idea that is implemented on a computer that also improves an existing technological process may be patent eligible." *Id.*

Having analyzed the representative claim in the intermediary settlement patent, the Court held that its limitations did no more than instruct a practitioner to implement the abstract idea of intermediated settlement on a generic computer. *Id.* at 2359. The Court analyzed the claim elements separately and determined that the function performed by the computer at each step of the process was purely conventional, and the functions were well-understood, routine, and previously known to the industry. *Id.* The Court noted that the method claims did not purport to improve the functioning of the computer itself, nor did they improve any other technology or technical claim. *Id.*

Here, citing *Alice* and other cases, AT&T argues that the claims of the '606 Patent are (1) directed to the abstract idea of filtering Internet content, and (2) the patent lacks any additional feature beyond generic computer elements.

## LEGAL STANDARD

Invalidity under 35 U.S.C. § 101 is a question of law that can be addressed at the pleading stage of litigation. *See Content Extraction*, 776 F.3d at 1346 (affirming the district court's dismissal for failure to state a claim because the claims of the patent-in-suit were

invalid as unpatentable subject matter).  As Judge Mayer recently commented, conducting

a patentable subject matter analysis early in the litigation can conserve judicial resources

and save the parties time and money.  *See Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709,

718–19 (Fed. Cir. 2014) (Mayer, J., concurring).

An issued patent is entitled to a presumption of validity, and a party arguing that a

patent claims ineligible subject matter under § 101 must prove as much by clear and

convincing evidence.[3]  *See Wolf v. Capstone Photography, Inc.*, No. 13-CV-9573, 2014

WL 7639820, at *5 (C.D. Cal. Oct. 28, 2014) (explaining that a "patent claim can be found

directed towards patent ineligible subject matter if the *only* plausible reading of the patent

must be that there is clear and convincing evidence of ineligibility").

## DISCUSSION

**I.    Step One:  The claims of the '606 Patent are directed toward the abstract idea of filtering Internet content.**

### A.  Arguments of the Parties

AT&T argues that the claims are directed to the abstract idea of "filtering

content," "filtering Internet content," or "determining who gets to see what," which is a

well-known "method of organizing human activity," analogous to hedging and

intermediated settlement.  Dkt. No. 23 at 6 (citing *Alice*, 134 S. Ct. at 2356); Hr'g Tr. at

6:17-19.  AT&T explains that filtering Internet content has a well-known concrete analog

that goes back decades, when parents and librarians forbade children from reading certain

---

[3] In *Ultramercial*, Judge Mayer wrote in a concurrence that "no presumption of eligibility
should attach when assessing whether claims meet the demands of section 101" because
"the PTO has for many years applied an insufficiently rigorous subject matter eligibility
standard" that was premised on a misunderstanding of the legislative history of the Patent
Act."  772 F.3d at 720.  The Federal Circuit has not expressly endorsed that position.

books, like J.D. Salinger's *Catcher in the Rye*. Hr'g Tr. at 6:20-25. In either situation,

someone would decide who gets to view certain content. *Id.* at 7:1-4. AT&T argues that

filtering content and filtering *Internet* content are in essence the same abstract idea,

because there is nothing inventive about the Internet, which is a now-ubiquitous

communications system, and ISPs have filtered Internet content since 1997, as the

specification of the '606 Patent teaches. Hr'g Tr. at 7:15-20; '606 Patent at 2:36–40.

AT&T also notes that filtering Internet content was so well-known that it was the

subject of Congressional action more than a year before the filing of the '606 Patent,

when Congress passed the Telecommunications Act of 1996 and explained that United

States policy was to encourage "development of technologies which maximize user

control over what information is received," and "to remove disincentives for the

development and utilization of blocking and filtering technologies that empower parents

to restrict their children's access to objectionable and inappropriate online material."

Telecommunications Act of 1996, Pub. L. No. 89-110, 110 Stat. 56 (enacted Feb. 8,

1996, codified 47 U.S.C. § 230(b)-(c)) (abolishing liability for ISPs that publish content

through filters). The Supreme Court has repeatedly denied patent eligibility to ideas that

are "long prevalent" and well-known, and AT&T argues that filtering Internet content is

well-known and longstanding within the field of Internet technology. Dkt. No. 23 at 6–7;

Hr'g Tr. at 12:9-12.

BASCOM relies on the Federal Circuit's recent decision in *DDR Holdings v.

Hotels.com, L.P.* to argue that the claims of the '606 Patent address a problem arising in

the realm of computer networks, and provide a solution expressly rooted in computer

technology, and therefore are not directed toward an abstract idea. *See DDR Holdings v.*

*Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014); *Alice*, 134 S. Ct. at 2359.

BASCOM argues that the recent decisions of the Supreme Court and Federal Circuit

make it clear that claims relating to computer and software technology are directed to an

abstract idea *only if* they are directed toward a longstanding and fundamental practice that

exists independent of computer or Internet technology, and filtering Internet content is

neither longstanding, fundamental, nor independent of the Internet.  Dkt. No. 29 at 13.

BASCOM rejects AT&T's characterization of the claims of the '606 Patent as being

directed toward filtering Internet content, because in doing so, BASCOM argues that

AT&T is merely boiling down the patent's purpose to a high-level statement about its

goals.  Adopting AT&T's approach, BASCOM argues, would mean that even a

mousetrap could be deemed patent ineligible because it is directed towards "catching

mice."[4]  *Id.*

   BASCOM also criticizes AT&T's reliance on Judge Mayer's concurrence in *I/P*

*Engine, Inc. v. AOL Inc.*, an unpublished decision, in which Judge Mayer concluded that

claims for content-based and collaborative-based Internet filtering were unpatenable

because they were "merely an Internet iteration of the basic concept of combining content

and collaborative data."  Dkt. No. 28 at 15–16; 576 Fed. App'x 982, 995 (Fed. Cir. Dec.

15, 2014)).  BASCOM claims that Judge Mayer's reasoning is inapplicable to this case

---

[4] The obvious flaw in this analogy is that a mouse trap would pass muster under Step Two because it adds the inventive concepts of being cheap, relatively clean, and transportable.  In contrast, notwithstanding any obviousness challenge, a hypothetical invention that recited a method for catching mice comprising laying cheese on the floor, observing said cheese at all times, and grabbing the mouse that nibbles on said cheese, would probably fail Step Two of the *Alice* framework because it fails to add an "inventive concept" to the abstract idea of catching mice.  In other words, the potential preemptive scope of the claims would substantially outweigh the invention's contribution to the field of rodent control.

because AT&T has not identified a non-technological analog to filtering Internet content, and because the claims of the '606 Patent are distinct.[5]

Finally, BASCOM argues that the Telecommunications Act of 1996 actually supports its position because Congress sought to "encourage the development of Internet filtering *technologies*," confirming that Internet filtering is a particular technological field, improved by the claims of the '606 Patent.  Dkt. No. 29 at 17 (citing *Alice*, 134 S. Ct. at 2358).

### B.  Analysis

The Court finds that the claims of the '606 Patent are directed toward the abstract idea of filtering Internet content.

The Court begins by "examin[ing] the claims because claims are the definition of what a patent is intended to cover."  *Ultramercial*, 772 F.3d at 709.  As already discussed, the Court finds Claims 1 and 22 to be representative.  *See supra* note 2.

Claim 1 recites elements for filtering Internet content, including: (1) a local client computer that generates network access requests for individual network accounts; (2) at least one filtering scheme; (3) sets of filtering elements; and (4) a remote ISP server, connected to the client computer, that associates each network account to at least one filtering scheme and filtering elements, and executes the filtering scheme after receiving network access requests from the client computer.  '606 Patent at 6:62–7:10.

---

[5] As AT&T notes in its Reply, many of BASCOM's arguments regarding Step One of the *Alice* analysis, *i.e.*, whether filtering Internet content is an abstract idea, are more properly directed to Step Two of the analysis, *i.e.*, whether the invention sufficiently adds an "inventive concept" to the abstract idea of filtering Internet content.  Therefore, the Court addresses many of these arguments in Step Two.

Claim 22 recites elements for an ISP server that filters Internet content, including (1) a list of allowed websites; (2) lists of excluded websites associated with network accounts; and (3) a filtering scheme that allows access to a web address if the address is on the list of allowed websites and on the list of excluded websites. *Id.* at 8:63–9:11.

A review of these claims makes it clear that the invention of the '606 Patent is directed toward the abstract idea of filtering content, a long-standing, well-known method of organizing human activity. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 609; *DDR Holdings*, 773 F.3d at 1257; *Ultramercial*, 772 F.3d at 715; *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344–45 (Fed. Cir. 2013); *Content Extraction*, 776 F.3d at 1347.

In *Accenture*, the Federal Circuit considered the validity of a patent claiming "a computer program . . . for handling insurance-related tasks," with software components for "generating and organizing insurance-related tasks." 728 F.3d at 1338. The system claims covered storing insurance information in a database, and when an event occurred, the system determined what tasks were necessary to accomplish the relevant transaction, and assigned those tasks to individuals. *Id.* The system included databases, a component to access the databases, a server, and an event processor. *Id.*

The Federal Circuit examined the system claims, which the district court held were directed to the abstract idea of "organizing data rather than to specific devices or systems." *Id.* at 1344. On appeal, Accenture argued that the specification demonstrated that the patent was an advance in computer software, and did not simply claim an abstract idea. *Id.* However, the Federal Circuit found that the claims at issue were directed toward the abstract idea of "generating tasks [based on] rules . . . to be completed upon the

occurrence of an event." *Id.* at 1344 (citation omitted).  The court proceeded to Step

Two, and found only "generalized software components arranged to implement an

abstract concept on a computer," which were insufficient to confer patentable subject

matter eligibility.  *Id.* at 1344–35.

In *Ultramercial*, decided after *Accenture* and *Alice*, the Federal Circuit analyzed

claims directed to a method for distributing copyrighted media products over the Internet,

by which an advertiser would pay for a customer to receive a copyrighted media product

without charge, in exchange for the customer viewing an advertisement.  772 F.3d at 712.

The plaintiff argued that the claims were directed to a method of advertising and content

distribution that had never before deployed on the Internet, and thus were not directed

toward an abstract idea.  *Id.* at 714.  The Federal Circuit disagreed, and found that the

ordered combination of steps set forth in the claims recited an "abstraction—an idea,

having no particular concrete or tangible form."  *Id.* at 715.  Although certain elements of

the relevant claims added a degree of particularity, the concept embodied by most of the

limitations only revealed the "abstract idea of showing an advertisement before

delivering free content."  *Id.*  The court acknowledged that all inventions rest upon an

abstract idea at some level, and clarified that not all software-based patents will

necessarily be directed toward an abstract idea; however, the court found that the claims

at issue were directed toward the abstract idea of using advertising as currency, and the

addition of novel and non-routine components to that idea did not make the idea more

concrete.  *Id.*

In *DDR Holdings*, the Federal Circuit held that claims covering "systems and

methods of generating a composite web page that combines certain visual elements of a

'host' website with content of a third-party merchant" passed muster under § 101.  773

F.3d at 1248.  The composite web page prevented third-party merchants from luring

visitor traffic away from a host website, and did so by creating a new web page that

permitted a visitor to "practically be in two places in the same time."  *Id.*  Rather than

being whisked away to a merchant's website, the visitor is navigated to a composite web

page that displays product information from the third-party merchant while maintaining

the host website's "look and feel."  *Id.*

The *DDR Holdings* court explained that, in some instances, "patent-ineligible

abstract ideas are plainly identifiable and divisible from the generic computer limitations

recited by the remainder of the claim."  *Id.* at 1256.  Although some claims may recite

"various computer hardware elements," such claims will not be patent eligible if

"directed at nothing more than performance of an abstract business practice on the

Internet or using a conventional computer."  *Id.*  The court noted that the "asserted claims

[did] not recite a mathematical algorithm," nor "[did] they recite a fundamental economic

or longstanding commercial practice."  *Id.* at 1257.  Although the claims *did* "address a

business challenge (retaining website visitors), [that] challenge [was] particular to the

Internet."  *Id.*  The court acknowledged that identifying the precise nature of the abstract

idea was more difficult than in *Alice* and its progeny, as evidenced by the defendant's

various characterizations of the abstract idea and the dissent's alternative

characterization.  *Id.*

Applying any of the characterizations, the Federal Circuit found that Step Two of

the *Alice* framework was met, because the claims did "not merely recite the performance

of some business practice known from the pre-Internet world along with the requirement

to perform it on the Internet," but instead, "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Id.* Importantly, the court noted that its decision in *Ultramercial* demonstrated that "not all claims purporting to address Internet-centric challenges are eligible for patent," but found the claims at issue were distinguishable because they "[did] not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)," and the claims "specif[ied] how interactions with the Internet are manipulated to yield a desired result . . . that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. In other words, "the limitations of the . . . asserted claims . . . taken together as an ordered combination . . . recite[d] an invention that [was] not merely the routine or conventional use of the Internet." *Id.* at 1259.

Finally, in *Content Extraction*, the Federal Circuit considered claims reciting a "method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information form the extracted data, and 3) storing that information in a memory," which could be carried out by software on an ATM that "recognizes information on a scanned check, such as the check's amount, and populates certain data fields with that information in a computer's memory." 776 F.3d at 1345. In conducting Step One of the *Alice* framework, the court acknowledged that the "Supreme Court has not 'delimit[ed] the precise contours of the 'abstract ideas' category.'" *Id.* at 1347 (quoting *Alice*, 134 S. Ct. at 2357). The Federal Circuit noted that there is no categorical business-method exception, but explained that "claims directed to the mere formation and manipulation of economic relations may involve an

abstract idea," such as "claims directed to the performance of certain financial transactions." *Id.* (citing *Alice*, 134 S. Ct. at 2356–57; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *Accenture*, 728 F.3d at 1338).  Applying the foregoing rules to the claims before it, the court agreed with the district court that the claims were directed toward "data collection, recognition, and storage," an "indisputably well-known [concept]" that humans have always performed, and banks have performed for some time.  *Id.* at 1347.  The court rejected the plaintiff's argument that its claims were distinct from those in *Alice* and other cases because they required a computer *and* scanner, and "human minds are unable to process and recognize the stream of bits output by a scanner," by noting that the claims in *Alice* also included computers that processed bit streams.  *Id.* (citing *Alice*, 134 S. Ct. at 2358).

Turning to this case, a review of Claims 1 and 22 make it clear that they are directed toward the abstract idea of filtering content.  *See* '606 Patent at 6:62–63 ("A content filtering system for filtering content retrieved from an Internet computer network . . . ."), 8:63 ("An ISP server for filtering content . . . .").  Although the claims clearly apply to *Internet* content, content provided on the Internet is not fundamentally different from content observed, read, and interacted with through other mediums like books, magazines, television, or movies, all of which have had to grapple with filtering complications similar to those addressed by the claims of the '606 Patent.

Although BASCOM relies heavily on the Federal Circuit's decision in *DDR Holdings*, it should be noted that the Federal Circuit did not decide in *DDR Holdings* whether the composite web page at issue was directed toward an abstract idea.  *See DDR Holdings,* 773 F.3d at 1257.  The court observed that the invention did not recite a

mathematical algorithm, nor did it recite a fundamental or longstanding commercial

practice, and to the extent it addressed a business challenge, that challenge was particular

to the Internet.  *Id.*  The court then explained that any characterization of the abstract idea

underlying the claims would satisfy Step Two.  *Id.*  Furthermore, to the extent the *DDR*

*Holdings* court analyzed whether the subject claims were directed toward an abstract

idea, it did so by exclusion, finding the claims did not fall squarely within the categories

of business methods or mathematical formulas previously analyzed by the Supreme Court

and Federal Circuit.  *Id.*  However, as the Federal Circuit noted shortly after its decision

in *DDR Holdings*, such categories of abstract ideas are not firmly established.  *Content*

*Extraction*, 776 F.3d at 1347.  Filtering content, or "determining who gets to see what," is

an abstract idea because it is a longstanding method of organizing human activity, and

BASCOM's application of the idea to the Internet does not, absent an inventive concept,

make that idea more concrete.  *See Ultramercial*, 772 F.3d at 716–17 ("[The Internet] is a

ubiquitous information-transmitting medium, not a novel machine.").  The Internet

application of filtering content merely allows a person of ordinary skill to filter content at

a greater scale.  *See* Hr'g Tr. at 10:10-12; *see also Ultramercial*, 772 F.3d at 716 ("[U]se

of the Internet does not transform an otherwise abstract idea into patent-eligible subject

matter.").

Finally, despite BASCOM's effort to distinguish and minimize Judge Mayer's

concurrence in *I/P Engine*, that concurrence is quite relevant to this case and this Court

finds it highly persuasive.  I/P Engine brought claims against AOL, Google, and other

companies for infringement of patents directed to a method for filtering Internet search

results that "utilize[d] both content-based and collaborative filtering."  576 Fed. App'x at

983–84.  Content-based filtering determines relevance by extracting features such as text

from an information item, while collaborative-based filtering determines relevance by

analyzing feedback from other users with similar interests or needs.  *Id.*  The Federal

Circuit held the claims were invalid as obvious; however, Judge Mayer *sua sponte* raised

the issue of patentable subject matter in his concurrence.  *Id.* at 992.  Judge Mayer

concluded that the claims asserted by I/P Engine did not disclose new technology, but

rather merely recited the use of a generic computer to implement "a well-known and

widely practiced technique for organizing information," and therefore fell outside the

ambit of § 101.  *Id.*  Judge Mayer noted that "if claims are drawn to the applications of

principles outside the scientific realm—such as principles related to commercial or social

interaction—no amount of specificity can save them from patent ineligibility."  *Id.*  The

claims at issue, in Judge Mayer's view, did not "improve the functioning of the computer

itself," nor "effect an improvement in any other technology or field."  *Id.* at 995 (citing

*Alice*, 134 S. Ct. at 2359).

Judge Mayer found that the claims "simply describe[d] the well-known and

widely applied concept that it is helpful to have both content-based and collaborative

information about a specific area of interest."  *Id.*  As an illustration, he posited a person

planning a visit to London, who might consult a guidebook that would provide

information about specific museums in London (content data), as well as gather advice

from other people about their impressions of these museums (collaborative data).  *Id.*

Thus, according to Judge Mayer, I/P Engine's claimed system was nothing more than an

Internet, computer-implemented iteration of the basic concept of combining content and

collaborative data.  *Id.*  Finally, Judge Mayer noted that the scope of the claimed

invention was "staggering" because it would potentially cover a significant portion of all online advertising. *Id.* Thus, in Judge Mayer's view, the vast reach of the claims was disproportionate to their "minimal technological disclosure." *Id.*

Similar to the claims at issue in *I/T*, the representative claims of the '606 Patent are no more than an Internet iteration of the basic concept of filtering content. Consider as a non-Internet analog parents who meticulously place certain magazines on the coffee table, accessible to their young children, while leaving others on the nightstand or in the closet for adult eyes only. Further, consider a high school English teacher, who must balance the individual maturity of each of her students and the cumbersome prospect of assigning different books to different students, against censoring books for the class as a whole. Finally, consider that movie theaters filter films based on ratings and restrict access based on age. The Court can conceive of multiple non-Internet analogs to the claims of the '606 Patent, and, as did Judge Mayer in *I/T*, the Court finds that the claims of the '606 Patent are, indeed, directed toward the abstract idea of filtering content, a well-known method of organizing human activity.[6] *See Alice*, 134 S. Ct. at 2356–57; *compare I/T Engine*, 576 Fed. App'x at 994–95, *with DDR Holdings*, 773 F.3d at 1258 (explaining that the composite web page addresses "a problem that does not arise in the 'brick and mortar' context . . . .").

---

[6] The Telecommunications Act of 1996 supports the Court's conclusion that the claims of the '606 Patent are directed toward the abstract idea of filtering content. The statute stated that the policy of the United States was "to remove disincentives for the development and utilization of blocking and filtering technologies . . . ." Telecommunications Act of 1996, PL 104–104, February 8, 1996, 110 Stat 56. That is, Congress merely sought to incentivize the application of *content filtering* to online material.

II.   **Step Two:  The recited claims fail to recite an "inventive concept" that transforms the abstract idea of filtering Internet content into a patent-eligible invention.**

    A.  **Arguments of the Parties**

AT&T argues that the claims contain no additional limitations that can supply an inventive concept, and thus fail Step Two of the *Alice* framework.  Specifically, AT&T argues that the claims do no more than recite routine and conventional activities performed by generic computer components, which the Supreme Court and Federal Circuit have expressly foreclosed as means of supplying an inventive concept to an abstract idea.

AT&T identifies each of the elements in Claim 1—(1) local client computer, (2) filtering scheme, (3) filtering elements, and a (4) remote ISP server.  '606 Patent at 6:62–7:10.  According to AT&T, the local client computer and ISP server are merely generic computers performing generic activities, and the specification shows they were known in the prior art.  *See id.* at 1:58–67, 2:62–64, 4:14–15, 4:1–4.  AT&T also contends that the filtering scheme is "any type of code" and the filtering elements are just "database entries," *i.e.*, generic software to implement the abstract idea of filtering Internet content.  Dkt. No. 23 at 2 (citing '606 Patent at 4:15, 3:1–8).  AT&T argues that *Alice* and *Accenture* have made it clear that an inventive concept cannot be supplied by the mere arrangement of generalized software components to implement an abstract idea on a computer.  *See Accenture*, 728 F.3d at 1345; *Alice*, 134 S. Ct. at 2358.

Furthermore, AT&T contends that Claim 1 cannot be patent eligible after *Alice* because it merely recites a "filtering scheme utilizing logical filtering elements" and instructs a practitioner to "execute it," and in *Alice*, the Supreme Court clarified that

simply seizing on an abstract idea and instructing one to "apply it" does not transform the idea into an eligible invention.  *See Alice*, 134 S. Ct. at 2358.

Finally, addressing the preemption concerns that undergird Step Two, AT&T notes that Claim 1 could potentially preempt using a single filtering scheme for all network accounts because the claim recites "at least one filtering scheme."  Hr'g Tr. at 18:15-22 (citing '606 Patent at 7:1–10).

AT&T makes many of the same arguments with respect to Claim 22, which recites elements for a content-filtering ISP server, including (1) a master-inclusive list, (2) exclusive-lists of excluded sites, and (3) a filtering scheme.  '606 Patent at 8:63–7:11. Again, AT&T contends that the specification of the '606 Patent teaches that these elements were well-known and are generic.  *Id.* at 1:44–50 (describing in the "Background of the Invention" the availability of exclusive filtering and inclusive filtering in the prior art).  AT&T rejects BASCOM's attempt to characterize hybridized filtering schemes as inventive, noting that the specification states that "it will be obvious to one of ordinary skill in the art that the filtering scheme can be any of a number of known-schemes, *or hybrids thereof.*"  *Id.* at 4:27–30 (emphasis added).

BASCOM argues that AT&T fails to look at the ordered combination of elements, and instead merely picks out individual elements and challenges them as non-inventive. Pl. Resp. Br. at 20; Hr'g Tr. at 36:12-16.  According to BASCOM, the '606 Patent is an advance over prior art because it provides content-filter functionality that can vary based on which end-user at a client computer is attempting to access the Internet, which is implemented by associating each end-user's individual controlled access network account with at least one filtering scheme and at least one set of filtering elements, *i.e.,* code that

determines whether to allow access to the requested Internet content.  *See* '606 Patent at

3:3–11; 4:66–5:3.  In short, BASCOM argues that the inventive concept is the special ISP

server that receives requests for Internet content, which the ISP server then associates

with a particular user and a particular filtering scheme and elements.   Hr'g Tr. at 35:12-

22.  Further, BASCOM contends that other claims, such as dependent Claim 23 and

independent Claim 24, have more specific inventive concepts.  *Id.* at 35:23-36:5.  Finally,

BASCOM cautions the Court not to overly impute into § 101 considerations reserved for

invalidity challenges under § 102, § 103, or § 112.  *See Cogent Medicine, Inc. v. Elsevier,*

*Inc.*, No. C-13-4470-RMW, No. C-13-4483, No. C-13-4486, 2014 WL 4966326, at *3

(N.D. Cal. Sept. 30, 2014).

### B.  Analysis

The Court finds that AT&T has met its burden of showing that the claims of the

'606 Patent fail to recite inventive features that warrant patent protection.  The first

inquiry is whether the Federal Circuit's holding and reasoning in *DDR Holdings* means

BASCOM's claims are rooted in the Internet and overcome a problem specifically arising

in the realm of the Internet.  *See also Trading Technologies Int'l, Inc. v. CQG, Inc.,* No.

05-CV-4811, 2015 WL 774655, at *5 (N.D. Ill. Feb. 24, 2015) (finding that the claims,

like those at issue in *DDR Holdings*, were "necessarily rooted in computer technology in

order to overcome a problem arising in the realm of computers").

The Federal Circuit expressly stated in *DDR Holdings* that "not all claims

purporting to address Internet-centric challenges are eligible for patents."  773 F.3d at

1258.  To illustrate the point, the court discussed its decision in *Ultramercial*, in which it

held that the claims at issue were ineligible for patent protection because they did no

more than recite the abstract idea of "offering media content in exchange for viewing an advertisement" coupled with "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet." *Id.* at 1265. Therefore, the issue is whether the claims of the '606 Patent are more analogous to those upheld in *DDR Holdings* or those invalidated in *Ultramercial*.

In *DDR Holdings*, the court found the claims at issue stood apart because "they [did] not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but rather "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Id.* In particular, the claims addressed the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after clicking on an advertisement and activating a hyperlink. *Id.*

The majority rejected the dissent's argument that the "store within a store" concept, such as a "warehouse store that contains a kiosk for selling a third-party partner's cruise vacation packages," was the pre-Internet analog of the asserted claims. *Id.* at 1258. While the concept may have been well-known by the relevant timeframe, the court found that the near-instantaneous transport between web pages made possible by the Internet is a problem that is absent in the "brick and mortar" context. *Id.* The court stated that it was the "challenge of retaining control over the attention of the customer in the context of the Internet" that the patent's claim addressed. *Id.*

*DDR Holdings* distinguished the claims in *Ultramercial* as "broadly and generically claim[ing] 'use of the Internet' to perform an abstract business practice" with insignificant added activity. *Id.* In contrast, the *DDR Holdings* court noted the claims before it specified "how interactions with the Internet are manipulated to yield a desired result that overrides the routine and conventional sequence of events ordinarily instigated by the click of a hyperlink." *Id.* The court held that the limitations of the claims, taken together as an ordered combination, recited an invention that "was not merely the routine or conventional use of the Internet." *Id.* at 1259. The court was also convinced that the claims posed no preemption threat because they contained additional features—a way to "create a composite web page by an outsource provider that incorporates elements from multiple sources to solve a problem faced by websites"—that ensured the claims were more than a veiled attempt to monopolize an abstract idea. *Id.*

Here, the Court looks at the "elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements [beyond those that recite the abstract idea of filtering content] 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1298). There can be little dispute that the featured elements of Claim 1—"local client computer," "remote ISP server," and "Internet computer network," are well-known, generic computer components. *See* '606 Patent at 1:58–59, 2:36–39, Fig. 8. The specification of the '606 Patent confirms as much. *See id.* Furthermore, the '606 Patent's specification teaches that filtering schemes are merely "any type of code which may be executed." *See id.* at 4:14–15. Filtering elements are described as database entries, such as a list of prohibited websites. *See id.* at 3:1–8; *see Accenture*, 728 F.3d at

1345 (explaining that a database of tasks did not limit the abstract concept in any meaningful way).  None of these elements transform the claims of the '606 Patent into a patent-eligible invention.

Additionally, considered in combination, the local client computer generates network access requests that are sent to the remote ISP server, which executes the filtering software.  *Id.* at 6:65–7:10  Filtering software, apparently composed of filtering schemes and filtering elements, was well-known in the prior art.  *See id.* at 1:58–59, 2:36–39 ("Initial attempts at Internet content control implemented the filter function on the local (client) machine . . . . [a]dditionally, some service providers . . . have used a third 'server-based' configuration where the filtering function is performed at the remote server site."); *id.* at 1:44–48 (explaining that the "filtering schemes" recited were known in the prior art).

BASCOM argues that the claims contain the limitation of filtering content by utilizing a specialized *ISP server*.  AT&T replies that this is merely an attempt to claim the configuration of the network, and in any event, claiming a network is not inventive.  *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (explaining that "send[ing] the information—with no further specification—is not even arguably inventive").  The Court finds that the '606 Patent teaches that using ISP servers to filter content was well-known to practitioners.  *See* '606 Patent at 2:36–39 (explaining that some ISPs, like America Online, perform the filtering function at a remote server site).  Thus, the ISP server cannot supply the necessary inventive concept absent additional features that reveal the ISP server as more than an attempt to claim the network.  Those features are nowhere to be found in the claims of the '606 Patent.

AT&T notes that the elements of the claims lack structure because they do not recite the structure or programming of the filtering scheme, to which BASCOM responds that is "beside the point," because the claims allow for different filtering schemes for different users. *See* Dkt. No. 29 at 19. However, the absence of structure for the generic computer elements of the claims raises the likelihood that such claims could preempt every filtering scheme under the sun, including a single filtering scheme for all network accounts. *See* '606 Patent at 7:4–9.

Nor are "controlled access network accounts" or the "customizable" features of the claims sufficiently inventive. Individual filtering on the Internet was a recognized need, and the recitation of "controlled access network accounts" in many of the claims is synonymous with a generic computer. *See id.* at 1:30-31 ("Many entities have found a need to block access to some web sites for certain end-users."), 1:44–48 ("Several mechanisms for filtering are available: exclusive filtering . . . inclusive filtering . . . and word-screening or phrase-screening . . . ."), 7:4–6 ("a remote ISP server coupled to *said client computer* and said Internet computer network, said ISP server associating each *said network account* to at least one filtering scheme . . . . (emphasis added)); *see OpenTV, Inc. v. Netflix, Inc.*, 2014 WL 7185921, at *7 (D. Del. Dec. 16, 2014) (finding that claims directed toward "the abstract idea of attempting to provide as much appropriately-selected content to users as possible" were without limitations to make them patent eligible). Moreover, to the extent BASCOM appears to suggest that the hybridized filtering schemes supply an inventive concept, the '606 Patent itself states that it would be obvious to an ordinary artisan that the filtering scheme can be any number of known hybrid schemes. *See* '606 Patent at 4:27–30.

The individual elements and ordered combination of elements in Claim 22 similarly recite generic computer components, and lack an inventive concept. *See id.* at 9:1–12 (reciting a "master-inclusive list of allowed sites," "exclusive-lists of excluded sites" associated with each "controlled access network account," and "a filtering scheme" that allows a "network access request" if the web address exists on the "master inclusive list but not on . . . [the] exclusive list").

The Court finds that the claims of the '606 Patent, considered individually, or as an ordered combination, are no more than routine additional steps involving generic computer components and the Internet, which interact in well-known ways to accomplish the abstract idea of filtering Internet content. *See Ultramercial*, 772 F.3d at 1265.

## CONCLUSION

The Court finds that, under the two-step *Alice* framework, the claims of the '606 Patent are directed toward the abstract idea of filtering content on the Internet, and the claims do not recite a sufficiently inventive concept to make them much more than an attempt to monopolize the abstract idea itself. Therefore, the Court **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(6), and **DISMISSES** Plaintiff's claims with prejudice. The Court will enter a separate judgment dismissing the case.

**SO ORDERED**.

May 15, 2015.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

30